**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

JUSTIN BROWNING
4841 HARVARD
DETROIT, MI 48224,

ALPHONSO BAITY, II,
311D 5TH STREET
HENDERSON, KY  42420,

                 Plaintiffs,

vs.

UNIVERSITY OF FINDLAY BOARD OF
TRUSTEES
1000 N MAIN ST
FINDLAY, OH 45840,

UNIVERSITY OF FINDLAY,
1000 N MAIN ST
FINDLAY, OH 45840,

DAVID W. EMSWELLER,
1000 N MAIN ST
FINDLAY, OH 45840,

BRANDI LAURITA,
1000 N MAIN ST
FINDLAY, OH 45840,

MATTHEW BRUSKOTTER,
1000 N MAIN ST
FINDLAY, OH 45840,

RACHEL WALTER,
1000 N MAIN ST
FINDLAY, OH 45840,

KEN WALERIUS
1000 N MAIN ST
FINDLAY, OH 45840,

BRIAN TREECE,
1000 N MAIN ST
FINDLAY, OH 45840,

CASE NO. 3:15-CV-2687

JUDGE

**JURY DEMAND ENDORSED
HEREON**

BREANNA ERVIN MILLER a/k/a
BREANNA JEANNETTE,
1000 N MAIN ST
FINDLAY, OH 45840,

JOHN AND/OR JANE DOE NOS. 1-10
EMPLOYEES OF THE UNIVERSITY OF
FINDLAY,

M.K.,
[ADDRESS UNKNOWN]
                                              Defendants.

## COMPLAINT

Plaintiffs, Justin Browning and Alphonso Baity, II, for their Complaint against Defendants, the University of Findlay, the University of Findlay Board of Trustees, David W. Emsweller, Brandi Laurita, Matthew Bruskotter, Rachel Walter, Ken Walerius, Brian Treece, Breanna Ervin Miller a/k/a Breanna Jeanette, John and/or Jane Doe Nos. 1-10 employees of the University of Findlay, and M.K., state as follows:

## INTRODUCTION

1.     Plaintiffs, Justin Browning and Alphonso Baity, II, are two African-American student-athletes who attended college at Defendant, the University of Findlay.  On a Saturday night in September 2014, Plaintiffs engaged in consensual sex with a Caucasian female, Defendant, M.K.  Several independent witnesses – both male and female – were present at Plaintiffs' house when the consensual sex occurred.  Each of these witnesses has attested that M.K.'s vocalization during the sex acts demonstrated her consent.  Following the voluntary and consensual sexual relations, M.K. sat and conversed with Plaintiffs and the aforementioned witnesses in the common room of the house.  After spending the night in Browning's bed and returning to her dormitory, M.K. spoke proudly among her friends – even bragging – about the prior evening's events, to wit: engaging in voluntary and consensual sexual acts with the Plaintiffs, including describing some of

2

the specifics about the actual sexual and physical acts engaged in between her and the Plaintiffs. For some reason, unknown by Plaintiffs, ten (10) calendar days later, M.K. claimed to the University of Findlay that Plaintiffs sexually assaulted her.

2.      The University of Findlay's "investigation" into M.K.'s allegations cannot be characterized as anything other than a sham.  Upon information and belief, the moment M.K. lodged her complaint, the University of Findlay decided to take the most drastic action available to it – expel Plaintiffs from school.  Indeed, despite the seriousness of the allegations, the University of Findlay's "investigation" started and ended within approximately 24 hours.  The University of Findlay failed to question all relevant witnesses.  In fact, the University of Findlay did not even question M.K.  The University of Findlay coerced several witnesses in an attempt to get them to change their testimony, including a threat of expulsion.  The University of Findlay's "investigation" lacked any form of due process – a point which key representatives of the University of Findlay have readily admitted to one of the parents.  Moreover, the University of Findlay failed to follow its own, published policies and procedures.

3.      Most troubling, the conduct of the University of Findlay's representatives was intentionally and inherently discriminatory because of Plaintiffs' race, ethnicities, and gender.  As explained in detail below, the University of Findlay has a history of discriminating against African-American males in allegations of sexual assault by Caucasian females.

4.      Perhaps the most confounding conduct of the University of Findlay was its blatant breach of the confidentiality of the proceedings related to M.K.'s false allegations.  Before the ink had dried on Plaintiffs' timely-filed and procedurally-compliant appeal from their expulsion (*i.e.*, the disciplinary process was still ongoing), the University of Findlay sent out a campus-wide email – an email received by students, faculty, and parents – that specifically identified Plaintiffs by name and wrongly accused them of sexual assault.  Several local media outlets quickly picked up

3

the email.  Plaintiffs' reputations, lives, and futures have been completely and irreparably shattered.  Although the bell cannot be un-rung, this lawsuit seeks redress for this intentional, malicious, and damaging conduct of the Defendants.

## PARTIES[1]

### Plaintiffs

5.      Plaintiff, Justin Browning ("Browning"), is a resident of Detroit, Michigan.  He is a 21 year-old African-American male.  At all relevant times, Browning was a junior and a student-athlete at the University of Findlay.  He was a member of the football team.

6.      Plaintiff, Alphonso Baity, II ("Baity"), is a resident of Henderson, Kentucky.  He is a 21 year-old African-American male.  At all relevant times, Baity was a junior and a student-athlete at the University of Findlay.  He was a member of the basketball team.

7.       Browning and Baity are collectively referred to as "Plaintiffs."

### Defendants

8.       Defendant, the University of Findlay, is a private school that receives federal funds, and is located in the City of Findlay, Hancock County, Ohio.  The University of Findlay is vicariously liable under the doctrine of respondeat superior for the acts and/or omissions of its employees and agents that occurred within the course and scope of their employment or agency.

9.      The University of Findlay Board of Trustees ("Board of Trustees") is comprised of more than thirty (30) persons who have the general obligation to protect the interests of the University of Findlay.  The Board of Trustees is being named as a defendant in this action to the extent that it is the proper party with standing and/or is the real party in interest to defend this

---

[1] To protect the identity of the individuals involved in this incident, including Defendant M.K., Plaintiffs use initials, which do not necessarily represent the actual initials of the individuals involved.  Despite the aforementioned, all parties to this lawsuit have full and actual knowledge of the identity of all individuals referenced in this Complaint.

action against the University of Findlay.  In that regard, the University of Findlay's "Preamble and Premises" to its policies and procedures states:

> The University of Findlay Board of Trustees, as the governing body of the University, is charged by law with the authority and duty to determine policies and to make or approve rules and regulations to promote the mission of the University.  This legally-imposed duty includes the authority to delegate administrative responsibilities to supervise and control the conduct of any member or segment of the University community who impedes, obstructs, or seriously threatens the mission of the University.

10.     The University of Findlay and the Board of Trustees are collectively referred to as the "University."

11.     Defendant, David W. Emsweller ("Emsweller"), is the University's Vice President for Student Affairs.  He is Caucasian.  Upon information and belief, he is a resident of Ohio.  All of his acts and/or omissions occurred within the course and scope of his employment with the University.

12.     Defendant, Brandi Laurita ("Laurita"), is the University's Assistant Athletic Director and Senior Woman Administrator.  She is Caucasian.  She is also the University's Title IX Coordinator.  Upon information and belief, she is a resident of Ohio.  All of her acts and/or omissions occurred within the course and scope of her employment with the University.

13.     Defendant, Matthew Bruskotter ("Bruskotter"), is the University's Assistant Dean for Environmental, Safety, Security, and Emergency Management.  He is Caucasian.  He is also the University's Title IX Investigator.  Upon information and belief, he is a resident of Ohio.  All of his acts and/or omissions occurred within the course and scope of his employment with the University.

14.     Defendant, Rachel Walter ("Walter"), is the University's Director of Housing.  She is Caucasian.  Upon information and belief, she is a resident of Ohio.  All of her acts and/or omissions occurred within the course and scope of her employment with the University.

15.     Defendant, Ken Walerius ("Walerius"), is the University's Director of Safety and Security.  He is Caucasian.  Upon information and belief, Walerius is a resident of Ohio.  All of his acts and/or omissions occurred within the course and scope of his employment with the University.

16.     Defendant, Brian Treece ("Treece"), is the University's Assistant Dean of Students and Director of Resident Life.  He is Caucasian.  Upon information and belief, he is a resident of Ohio.  All of his acts and/or omissions occurred within the course and scope of his employment with the University.

17.     Defendant, Breanna Ervin Miller a/k/a Breanna Jeanette ("Miller"), was, at all relevant times, a Resident Assistant in the University's Deming Hall.  She is Caucasian.  Upon information and belief, she is a resident of Ohio.  All of her acts and/or omissions occurred within the course and scope of her employment with the University.

18.     Defendants, John and/or Jane Doe Nos. 1-10, employees of the University, are persons who were involved in the "investigation" and/or grievance proceedings involving Plaintiffs, and whose identities could not be discovered by Plaintiffs despite due diligence and their best efforts.

19.     The University ratified the acts and/or omissions of its above employees, collectively referenced as the "University Defendants."

20.     Defendant, M.K., is a resident of New York.  She is a Caucasian female.  At all relevant times, M.K. was a freshman and student at the University.

6

## WITNESSES

21.     Q.J. is an African-American male.  A junior basketball player, Q.J. was a witness to the central events at issue in this case.

22.     Z.W. is an African-American male.  A senior football player, Z.W. was a witness to the central events at issue in this case.

23.     R.J. is an African-American male.  He was a witness to the central events at issue in this case.

24.     A.D. is a Caucasian female.  She was a witness to the central events at issue in this case.

25.     K.D. is A.D.'s mother.  She has knowledge of some of the events at issue in this case.

26.     K.A. is a Caucasian female.  She was a witness to the central events at issue in this case.

27.     A.J. is a Caucasian female.  She has knowledge of some of the events at issue in this case.

28.     H.S. is a Caucasian female.  She has knowledge of some of the events at issue in this case.

29.     J.F. is a male who has knowledge of some of the events at issue in this case.

## JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction over the claims arising under the federal statutes and the United States Constitution pursuant to 28 U.S.C. § 1331.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the claims in this action that are within this Court's original jurisdiction

that they form part of the same case or controversy under Article III of the United States Constitution.

31.     Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. 1332(a), because there is complete diversity between Plaintiffs and each of the respective Defendants, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

32.     This Court has personal jurisdiction over the Defendants because Defendants committed improper and illegal acts in this judicial district.

33.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims raised herein occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

### University of Findlay

34.     The City of Findlay (population 41,000) is located in Hancock County, Ohio, approximately 40 miles south of Toledo, Ohio. The racial makeup of the city is approximately ninety-one percent (91%) Caucasian and two percent (2%) African-American. *See* http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=CF (last visited December 21, 2015).

35.     The University is a private university located in Findlay, Ohio. Of its 4,000 undergraduate students, approximately 68 are African-American males (1.7%). *See* Enrollment by Racial/Ethnic Category (Fall 2014), available at http://www.findlay.edu/offices/academic/-registrar/Documents/StudentDiversity2014.pdf (last visited May 29, 2015) ("University Enrollment").

36.     In 2013, the University received a $287,000 federal grant from the United States Department of Justice's Office on Violence Against Women ("OVW") (the "OVW Grant"). Upon

information and belief, the OVW Grant was part of the OVW's Grants to Reduce Sexual Assault, Domestic Violence, Dating Violence, and Stalking on Campus Program.  Upon information and belief, according to the OVW Grant, the University receives the funds over a 36-month period. Accordingly, the University was receiving the federal OVW Grant funds at or around the time of the events that are the subject of this lawsuit.

37.    Upon information and belief, the University accepts students who pay tuition and other University-required payments with Federal financial aid/loans directly distributed from the federal government to the students.  Upon information and belief, the University was accepting students who made payments with federal financial aid/loans at or around the time of the events that are the subject of this lawsuit.

38.    The University provides campus housing for many of its students.  As part of its campus-housing program, the University owns a 5-room house located at 438 Howard Street, Findlay, Ohio.

39.    During the beginning of the 2014-15 academic year, at all relevant times, four student-athletes – Browning, Baity, Q.J. and Z.W. – shared this house.  A diagram of this 1,229 square-foot  house, as well as the bedroom locations, is set forth in the below diagram:



Room A is the bedroom shared by Browning and Baity.  Room B is Q.J.' bedroom.  Room C is Z.W.'s bedroom.

40.     Browning and Baity were good students with good reputations.  They were also important members of their respective sports teams.   They were well-liked by the campus community.

### Plaintiffs and M.K. Meet and Become Friends

41.     Early in the 2014-15 academic year, Baity and Q.J. met M.K.  These students quickly became friends.

42.     Initially, M.K. liked Q.J.  M.K. visited 438 Howard Street on multiple occasions, either with friends or alone, to see Q.J.  During her visits to the home, M.K. became friendly with the other housemates, including Browning and Baity.  Even when Q.J. was not present, M.K. would sometimes visit to socialize with Plaintiffs and the other roommate/housemate, Z.W.  In other words, M.K. knew all of the housemates at 438 Howard Street, and she was very comfortable with each of them.

43.     As an example of her comfort level with each of the housemates at 438 Howard Street, M.K. had no reservations about engaging in sexual relations with Q.J. while Plaintiffs and Z.W. were present in the small home.  Indeed, on one occasion, M.K. was unperturbed when several of the housemates walked in on M.K. giving oral sex to Q.J. in the common room; even after she noticed them, she continued to perform oral sex on Q.J.  Later that evening, after socializing with all of the residents of 438 Howard Street, M.K. accompanied Q.J. to his bedroom and engaged in further sexual relations with him.

44.     Plaintiffs and M.K. also socialized on the University's campus in buildings such as Henderson Dining Hall and at campus events.

## Football Team Breakfast - September 20, 2014

45.     The University football team was scheduled to play at Tiffin University on the afternoon of Saturday, September 20, 2014.

46.     That morning, as is customary, the University football team gathered in Henderson dining hall for the team breakfast.

47.     M.K. approached Browning in the dining hall in front of Z.W. and Browning's football team position coach, Thomas Howard.  After giving him a hug, M.K. attempted to give Browning her cellular telephone number so that they could meet after the game.  Given team rules, despite M.K.'s insistence, Browning politely refused to take the number.

48.     After breakfast, the University football team traveled to Tiffin for the game.  Baity, Q.J., R.J., and K.A. attended the game as spectators.

## 438 Howard Street - September 20, 2014

49.     The University football team returned to campus after the game.  Browning, Baity, and Z.W. eventually returned to 438 Howard Street.

50.     That evening, a party was scheduled to take place at the "Mascot House," located several blocks from 438 Howard Street.  Plaintiffs and friends planned to attend the party.

51.     Prior to the party, the residents of 438 Howard Street held a "pre-party."  Present at the pre-party were Browning, Baity, Z.W., Q.J., R.J., K.A., and others.  Although there was alcohol at the pre-party, Q.J., Baity, and K.A. drank absolutely no alcohol.

52.     Later that evening, several of these individuals left 438 Howard Street to attend the Mascot House party.  K.A. drove R.J. in her vehicle.  Baity drove Browning and Z.W. in his vehicle.  Q.J. stayed home that evening.

**Mascot House - September 20-21, 2014**

53.     There was a large party at the Mascot House.  M.K. was present.  She appeared to be drinking something out of a Gatorade bottle.

54.     As soon as Browning and Baity arrived at the party, M.K. spotted Baity and gave him a hug, then asked where Browning was.  After finding Browning, she ran to him.  She gave him a big hug.  As they talked, she grabbed Browning's phone and entered her cellular telephone number.  M.K. did not appear to be intoxicated.

55.     After a few minutes, M.K. led Browning to the dance floor, and they began dancing together. They had their hands all over each other.  Indeed, M.K. was grinding her buttocks against Browning's crotch region.  M.K. and Browning also kissed on the dance floor.  This activity lasted several minutes.

56.     Baity and K.A. did not consume any alcohol at the Mascot House.

57.     Eventually, M.K. told Browning that she wanted to leave the party with him.  She consented to return to 438 Howard Street.  M.K. and Browning found K.A. and R.J., and walked to K.A.'s car.  K.A. drove R.J., Browning, and M.K. back to 438 Howard Street.

58.     Z.W. and A.D. walked home.  Baity left the party and went to get something to eat at a fast-food restaurant.

### 438 Howard Street - September 21, 2014

59.     Browning, M.K., R.J., and K.A. returned to 438 Howard Street.  Upon entering the home, they found Q.J. on the couch in the common area.  There was brief conversation among the group.

60.     After a few minutes, R.J. and K.A. decided to drive to Taco Bell for food, after taking orders from Browning and Q.J.  M.K. declined the offer to pick up and/or purchase food for her.

61.     Browning and M.K. exited the common area, entered Browning's bedroom – Room A – and closed the door.  Q.J. remained on the couch.  Q.J. witnessed M.K.'s voluntary consent to enter Browning's bedroom.

62.     Z.W. and A.D. then returned to 438 Howard Street.  They had a brief conversation with Q.J. in the common area.  During their conversation, Z.W., A.D., and Q.J. heard consensual sexual activity in and coming from within Browning's bedroom.  M.K. loudly vocalized words of voluntary consent and encouragement, including use of the word "yes."  Although Z.W., A.D., and Q.J. could not see what was occurring in Room A, it was readily apparent from the sounds and words coming from Room A that the sexual activity was consensual.  Thereafter, Z.W. and A.D. walked into Z.W.'s bedroom (Room C).  Q.J. remained on the couch.

63.     In Browning's bedroom, Browning and M.K. engaged in consensual sexual activity.  There is no question that M.K. had the capacity to consent.  M.K. voluntarily disrobed and performed oral sex on Browning.  Later, Browning and M.K. engaged in vaginal sex in multiple positions.  At various times, M.K. was on top of Browning.  Browning never coerced, threatened, forced, or otherwise made or threatened M.K. to perform any sex act or engage in any

13

type of sexual activity or physical contact.  M.K. never told Browning "No," "Don't," and/or "Stop," and did not directly, indirectly, implicitly, or otherwise convey or communicate in any method or form her unhappiness, unwillingness, disagreement with, rejection of, or objection to engaging in physical contact, sexual activity(ies), and physical intimacy with Browning.  To the contrary, M.K. affirmatively consented to the sexual activity(ies) by saying "yes."  At all times, M.K. initiated all sexual activity and physical contact of a sexual or intimate nature with Browning, and physically and verbally encouraged and voluntarily consented to such contact and interaction.

64.     Meanwhile, Baity returned to 438 Howard Street.  He also heard the consensual sexual activity coming from Room A, a bedroom he shares with Browning.  Baity and Q.J. spoke in the common room for a period of time.  Then, when there seemed to be a lull in the sexual activity between Browning and M.K., Baity knocked on the door and entered the room to retrieve his phone charger.

65.     Baity entered the bedroom and witnessed M.K. performing oral sex on Browning. After noticing Baity, M.K. invited Baity to participate in voluntary and consensual sexual activity with her.  M.K. initially performed oral sex on Baity.  Several minutes later, M.K. moved to Baity's bed and invited him to have vaginal sex with her.  M.K. and Baity engaged in vaginal sex in several positions.  Browning remained in the room during Baity and M.K.'s activity, but did not participate with them.  All of this sexual activity was voluntary and consensual.  Baity never coerced, threatened, forced, or otherwise made or threatened M.K. to perform any sex act or engage in any type of sexual activity or physical contact.  M.K. never told Baity "No," "Don't," and/or "Stop," and did not directly, indirectly, implicitly, or otherwise convey or communicate in any method or form her unhappiness, unwillingness, disagreement with, rejection of, or objection to engaging in physical contact, sexual activity(ies), and physical intimacy with Baity.  To the contrary, M.K. affirmatively consented to the sexual activity(ies) by saying "yes."  At all times, M.K. initiated all

14

sexual activity and physical contact of a sexual or intimate nature with Baity, and physically and verbally encouraged and voluntarily consented to such contact and interaction.

66.     Meanwhile, R.J. and K.A. had returned to 438 Howard Street from Taco Bell. While eating in the kitchen, they also heard consensual sexual activity coming from Room A, including hearing a female voice saying "yes."

67.     After he finished engaging in voluntary and consensual sexual relations and/or activity with M.K., Baity got dressed, exited his bedroom, and joined Q.J. in the common room. Eventually, Z.W., A.D., R.J., and K.A. joined Baity and Q.J. in the common room.

68.     While everyone was talking in the common area, M.K. emerged naked from the bedroom.  She laughed about maybe having to vomit; however, she did not vomit.  Browning followed, his lower body covered by a blanket.  M.K. was given a trash can and some water.  More importantly, Browning and the other female guests attempted to convince M.K. to cover herself. Browning even handed M.K. her bra and panties.  Unashamed, M.K. ignored these requests and continued with her exhibitionism.  Indeed, M.K. walked over to the couch, sat down, and proceeded to participate in the group's conversation.

69.     Although A.D. attempted to call one of M.K.'s friends, M.K. told her that she was going to spend the night with Browning.

70.     Thereafter, M.K. returned voluntarily to the bedroom with Browning.  M.K. and Browning engaged in further consensual sexual relations on Browning's bed.  M.K. was in control, physically and verbally encouraged Browning's participation, and vocalized enjoyment. Indeed, M.K. was on top of Browning while the two engaged in vaginal sex.  Browning never coerced, threatened, forced, or otherwise made or threatened M.K. to perform any sex act or engage in any type of sexual activity or physical contact.  M.K. never told Browning "No," "Don't," and/or "Stop," and did not directly, indirectly, implicitly, or otherwise convey or communicate in any

15

method or form her unhappiness, unwillingness, disagreement with, rejection of, or objection to engaging in physical contact, sexual activity(ies), and physical intimacy with Browning.  To the contrary, M.K. affirmatively consented to the sexual activity(ies) by saying "yes."  At all times, M.K. initiated all sexual activity and physical contact of a sexual or intimate nature with Browning, and physically and verbally encouraged and voluntarily consented to such contact and interaction.

71.     Baity entered the room and climbed into his bed to go to sleep.  Baity witnessed the voluntary and consensual sexual activity that occurred between Browning and M.K., including M.K.'s use of the words "yes" and "yeah."

72.      Based upon the totality of the circumstances, it was the individual and collective impression of everyone in the house that evening – including those who had absolutely no alcohol to drink (Baity, Q.J., and K.A.) – that M.K. knew what she was doing at all times.  She was in total command and control of her actions.  In other words, she had the capacity to, and indeed did, voluntarily consent to all of the activity that occurred that evening.

73.     Eventually, everyone fell asleep.

74.     The next morning, at approximately 10 a.m., M.K. and Browning awoke.  Others in the house also awoke.  When M.K. could not find her keys, Plaintiffs helped her locate them.  Thereafter, the group conversed in the house for approximately one hour.  M.K. made no accusations of any alleged rape or sexual assault.  Indeed, instead of seeking assistance from the University Police Department, University officials, related campus authorities, other occupants of the house, or even one of her friends, upon information and belief, M.K. simply returned to her dormitory at Deming Hall on the University campus.

### Deming Hall - September 21, 2014

75.     After M.K. returned to her dormitory, she recounted the evening with a number of women who lived on her floor.  Witnesses included H.S. and Miller (the Resident Assistant).

16

76.     According to H.S., M.K. boasted about having voluntary and consensual sexual relations with Plaintiffs.  M.K. professed to be very proud of the prior evening's events.  She was not upset in the slightest.  Indeed, M.K. never mentioned any alleged sexual assault or rape to any of her female friends and acquaintances, or to her Resident Assistant.

### Off-Campus Residence - September 21 or 22, 2014

77.     Upon information and belief, at some point on September 21 or 22, 2014, M.K. also returned to an off-campus house in which J.F. lived because she had left some of her belongings there the previous night.  She personally told J.F. that she had voluntary and consensual sex with two housemates who lived at 438 Howard Street.  Additionally, M.K. bragged and smiled about how she was running around 438 Howard Street completely naked the night before.  At no point during this conversation did M.K. state, infer, or allude to the fact that anything that occurred the evening before was non-consensual.  Instead, it was the opinion of J.F. that M.K. had engaged in voluntary and consensual activity the prior evening at 438 Howard Street.

### September 21, 2014 to October 1, 2014

78.     Upon information and belief, during this 10-day period between September 21, 2014 and October 1, 2014, contrary to the University's policies (as outlined below), M.K. failed to preserve evidence, failed to avoid Plaintiffs, failed to call anyone for support, and failed to seek immediate or follow-up medical care.

79.     Indeed, on or about September 24, 2014, or September 25, 2014, M.K. interacted with Baity, Z.W., and other friends of Plaintiffs in Henderson dining hall.

### University Policies:  Sexual Assault Policy

80.     The University has published an Undergraduate Catalog that outlines University Policies.  The policies apply to all University students and are in effect at all times.  All of the

University's policies are available for review online.[2] *See* Undergraduate Catalog, University Policies, http://catalog.findlay.edu/en/current/Undergraduate-Catalog/Copy-of-University-Policies (Last visited December 21, 2015).  In bold on the policy website, it states, "Students are responsible for becoming familiar with all of these published statements and for observing them as they live on-campus, attend class, or participate in any University-related activity." *Id.*

81.    One of the University policies pertains to Sexual Assault, Domestic Violence, Dating Violence, and Stalking ("Sexual Assault Policy").  Upon information and belief, M.K. received a copy of the Sexual Assault Policy at the time of her admission to the University.

82.    Pursuant to the Sexual Assault Policy, "sexual assault" is defined by "this policy and federal law."  The Sexual Assault Policy defines "sexual assault" as "[a]ny sexual act directed against another person without the consent of the victim, including instances where the victim is incapable of giving consent."

83.    Pursuant to the Sexual Assault Policy, the University defines consent as "[a] knowingly, voluntary, and affirmatively communicated willingness to participate in a particular sexual activity or behavior.  It must be given by a person with the ability and capacity to exercise free will and make a rational, reasonable judgment.  Consent may be expressed either by words or actions, as long as those words or actions create a mutually understandable permission regarding the conditions of sexual activity."  The relevant standard for capacity is measured by a sober, reasonable person in the same position.

84.    To address the issue of sexual assault, the University claims to have a number of prevention programs.  The University also claims to require all faculty, staff, and students to

---

[2] Because nearly all of the proceeding University policies and procedures are available for public review online, Plaintiffs do not attach said policies and procedures hereto.  The only exception is the Title IX Investigation Procedures, referenced below, which is attached hereto as Exhibit A.

participate in an annual on-line training program.  The University purports to train its faculty on the University policies (at a minimum, those discussed in this Complaint), as well as other federal laws, including, but not limited to, Title IX to the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) ("Clery Act"), and the Campus Sexual Violence Elimination Act ("Campus SaVE Act"), which amended the Clery Act.

85.     The Sexual Assault Policy states that "it is important [for accusers] to preserve evidence so that the University can successfully conduct an internal investigation."

86.     Accusers are also instructed to, *inter alia*, "find a safe environment away from the assailant"; call a person "who will offer unconditional support"; seek immediate medical care; refrain from "chang[ing] clothes, bath[ing], douch[ing], or brush[ing] teeth until evidence is collected"; "follow up with a healthcare provider one to two weeks following the assault"; and "seek counseling services."   Upon information and belief, M.K. did not take any of these recommended actions as set forth in the Sexual Assault Policy.

87.     The University acknowledges that it has a duty to investigate allegations of sexual assault.  Indeed, the University contracts and promises that it will investigate such allegations. With respect to the investigation, the University contracts and promises that it will conduct "a prompt, impartial, and thorough investigation"; that the investigation will be conducted in a "fair and impartial manner"; that the investigation will be conducted by unbiased, trained personnel schooled in investigative techniques; and that the university will maintain the confidentiality of all parties involved.

88.     The Sexual Assault Policy states that sexual assault investigations are conducted pursuant to Title IX.  The University represents that a typical investigation will take no more than 60 calendar days, absent extraordinary circumstances.

19

89.     The Policy provides that the accuser and accused are entitled to the opportunity to be accompanied to University interviews or other related meetings by an advisor of their choice, available to provide support to the individual.

90.     The Policy states that investigation and disciplinary decisions will apply a preponderance of the evidence standard.  An expelled student has 72 hours to appeal the decision. All decisions must be in writing.

<u>**University Policies: Title IX Investigations**</u>

91.     Another University policy pertains specifically to Title IX Investigations ("Title IX Investigation Policy").

92.     Title IX prohibits discrimination on the basis of gender in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. §§ 1681(a), 1687. All public and private educational institutions that receive any federal funds must comply with the requirements of Title IX.

93.     The University is subject to Title IX by virtue of, *inter alia*, its acceptance of federal financial assistance in the form of Pell Grants, Stafford Loans, and other forms of student aid administered under Title IV of the Higher Education Act Amendments.

94.     The University must comply with Title IX.

95.     As previously alleged, Laurita is and was at all relevant times the Title IX Coordinator.  Bruskotter is and was at all relevant times the Title IX Investigator.

96.     The Title IX Investigation Policy states that all information prepared for and/or acquired from a University Title IX investigation shall be confidential, unless necessary to protect the health, safety, and well-being of the University community.

97.     The University claims to be committed to maintaining the privacy of the parties involved in an alleged incident to the fullest extent possible under applicable law.  The University

also claims that, in all cases, it will take care to protect the identities of the parties by discussing the allegations only with those who have a legitimate administrative or legal reason to know. Indeed, the University contracts and promises that it will not disclose information about an alleged sexual assault to third parties except as may be required or permitted by federal or state law.

98.     The University is committed, under Title IX and the Title IX Investigation Policy, to providing a prompt, fair, and impartial investigation and resolution.  Indeed, the University's Title IX Investigation Policy contemplates a hearing in order to resolve the matter:

> The University of Findlay is committed to providing a prompt, fair and impartial investigation and resolution to all alleged incidents of discrimination prohibited by Title IX.  Investigations, *hearings* and disciplinary decisions will be conducted by applying a preponderance of the evidence standard.  This means that investigators or *hearing panels* will use their best judgment to determine whether, more likely than not a violation of the Non-Discrimination Policy has occurred.

(Emphasis added.)

99.     The Title IX Investigation Policy provides that, upon receipt of a complaint or information of sexual harassment and/or violence, the Title IX Investigator and Title IX Coordinator will discuss the issue and develop a plan of action to begin the investigation following the University's Title IX Investigation Procedures.

100.     Appendix I to the Title IX Investigation Policy ("Title IX Investigation Procedures") outlines the protocol to be followed in such investigations, a true and accurate copy of which is attached as **Exhibit A**.

## University Policies: Statement of Student Rights and Responsibilities – The Student Handbook

101.     The University also publishes a policy entitled the Statement of Student Rights and Responsibilities ("Student Handbook").

102.    The University acknowledges that it has the duty to foster and protect certain student rights, including the right to pursue educational, recreational, social, cultural, and residential activities.

103.    The Student Handbook acknowledges that University students have "basic civil and human rights and immunities which the University has a duty to protect."

104.    In addition to the above, before being questioned in an investigation, "a student shall be advised of the specific allegations made against him or her, and that he or she is not required to make any statement but may voluntarily make a statement and explanation of the facts and submit information in proof of the same."

105.    The Student Handbook purports to provide the following procedural safeguards:

(a)     In a matter in which a student feels that disclosure of events surrounding his/her actions before a committee may be detrimental to his/her reputation, he/she may request that the vice president for student affairs adjudicate the matter and not make a referral to the Conduct and Discipline Committee. Should the student choose this alternate route, the vice president for student affairs will review the matter and render a decision.

(b)     The student shall be furnished with a written statement of allegations against him/her along with a notice of the time and place of the Conduct and Discipline Committee meeting.

(c)     The student shall be given (at the discretion of the Conduct and Discipline Committee Chair) reasonable opportunity to introduce information by way of written and/or oral statements from witnesses and otherwise in his/her own defense. Outside parties may not represent or be present at a Conduct and Discipline Committee meeting. The Conduct and Discipline Committee shall weigh the information, reach a decision, and determine and impose the appropriate sanction, if any.

(d)     A student who has been found responsible for misconduct of a non-academic nature and who is subsequently suspended or dismissed may file a written application for permission to appeal to the President. Such application shall identify the matter and contain a concise statement of the reason for the appeal.

106.    Any complaint determined to be intentionally dishonest or made maliciously without regard for the truth shall be considered misconduct and will subject such complainant to disciplinary action.

### University Policies: Anti-Discrimination Policy

107.    Article X of the Student Handbook addresses the University's Non-Discrimination, Anti-Harassment, and Hostile Campus Environment policy ("Anti-Discrimination Policy"). According to this policy, each student has the right to study and work in an atmosphere that promotes equal opportunities and prohibits discriminatory practices based upon race and gender.

### The University's 24-Hour Sham Investigation - October 2014

108.    Upon information and belief, on October 1, 2014, M.K. made a false written and/or verbal report to the University that she was sexually assaulted by Plaintiffs on the evening/early morning of September 20/21, 2014.  This false report was made ten (10) days following her engaging in voluntary and consensual sexual activity with Plaintiffs, and following her own voluntary disclosure, boasting, and public statements about her voluntary and consensual sexual activity with Plaintiffs to her dormitory neighbors and friends, and J.F.

109.     In response to M.K.'s false report of sexual assault, the University Defendants conducted a sham investigation in complete and utter disregard of the University's policies and procedures.  Upon information and belief, none of the procedures in the University's Title IX Investigation Procedures were followed.

110.    Remarkably, the University did <u>not</u> interview or question M.K. about the alleged incident.  The University did not follow-up on any of the potential witnesses identified in her false report.  And, the University did not follow-up on M.K.'s reference to existing videos of the evening.

111.    Other than M.K. and Plaintiffs, there were independent, adult witnesses to this alleged sexual assault.  There were three African-American males – Q.J., Z.W., and R.J. – who had personal knowledge and information regarding the events in question.  Inexplicably, the University Defendants only interviewed Q.J.  Upon information and belief, during Q.J.' interview, he unequivocally stated that any sexual activity between Plaintiffs and M.K. was voluntary and consensual for all who participated.  Z.W. and R.J. were not interviewed prior to Plaintiffs' expulsion from the University, even though the University Defendants were aware of their names and that they had relevant knowledge.  Upon information and belief, the University simply believed that, following Q.J.'s statement, and because of their race, ethnicities, and/or gender, the statements of Z.W. and R.J. would be biased in favor of Plaintiffs and contain no useful information.  Not only was the refusal to interview Z.W. and R.J. racial discrimination against Plaintiffs during the sham-interview process, but it demonstrates intentional racial discrimination against Z.W. and R.J.  This provides further evidence of the racial biases employed by the University Defendants during their sham investigation.

112.    Instead, the University chose to interview two Caucasian women present in the home on the evening that M.K. engaged in consensual sexual activity, and one Caucasian woman who was not present at 438 Howard Street on the evening in question.  Upon information and belief, the University believed that these Caucasian, female witnesses would corroborate M.K.'s story.

113.    By selecting witnesses invidiously based on race, ethnicity, and/or gender, the University presupposed that they would act in accordance with the race and gender roles that have no legitimate purpose in modern society, and did so intentionally to frame the sham investigation to predetermine an outcome of responsibility.  The racial and gender selectivity was thus intentionally designed to harm Plaintiffs because of their race and/or gender.

24

114.    However, this tactic, or prejudiced short-sightedness, backfired.  The University received information and statements corroborating Plaintiffs' version of events from K.A. and A.D.  Because of this, one of the Caucasian women (K.A.) was terminated from her work-study, campus security dispatch job, and forced to take another work-study position with the University. The other Caucasian woman (A.D.) was threatened with expulsion, herself, because she corroborated Plaintiffs' version of events.  In that regard, it was not until K.D. (A.D.'s mother) called the University's Dean and/or the University's general counsel after consulting with a lawyer that the University withdrew A.D.'s expulsion.[3]

115.    These attempts by the University Defendants to threaten and coerce student-witnesses to change their first-hand accounts from the truth to something false not only demonstrates the University Defendants' lack of impartiality and bias, as well as evidence of intentional discrimination against Plaintiffs, but it also violates the Sexual Assault Policy, which states that the "University prohibits and will not tolerate any attempts by any person(s) or group to prevent the institution from investigating incidents of these actions or to 'cover up' their occurrence."

116.    Despite failing to interview witnesses who were present that evening, the University Defendants chose to interview another Caucasian woman, A.J. – who was <u>not present</u> – regarding her past relationship with Baity.  Again, this tactic backfired.  A.J. told the University Defendants that Baity treated her with respect at all times and did not pressure her, coerce her, or otherwise engage in conduct forcing her to engage in sexual relations with him, or otherwise treat her with violence or abuse.

---

[3] Upon information and belief, when speaking with K.D., the University's representative stated that the University simply wanted to "bury" this incident and move on.

117.     Upon information and belief, no audio recordings were taken or maintained by the University Defendants.  Instead, upon information and belief, each person was interviewed by two persons, and each interviewer took his/her own handwritten notes.  Thereafter, one of the interviewers condensed the handwritten notes into an alleged "summary" statement and permanently discarded the handwritten notes.  These biased and selective "summary" statements are the only evidence that the University Defendants has maintained to "memorialize" the interviews with Plaintiffs and any other person with whom the University Defendants elected to speak.

118.      On the afternoon of October 2, 2014, Plaintiffs were separately interviewed by University of Findlay representatives.  Browning was interviewed by Bruskotter and Laurita, and Baity was interviewed by Walerius and Walter.

119.     Plaintiffs were not advised of the specific nature of the complaint made against them by M.K., other than a general allegation of sexual assault.  Indeed, at no time before, during, or after the interviews, despite specific questions from Plaintiffs collectively and respectively, did the University Defendants provide the specific allegations made against Plaintiffs.

120.     At no time during the interviews were Plaintiffs collectively or respectively advised of their right(s), under the Sexual Assault Policy, to have an advisor of their choice available to provide support.

121.     The sum and substance of Plaintiffs' statements during the interviews were that:  (i) M.K. was never incapacitated at any point and was able to and did voluntarily engage in and consent to all of the sexual activity between her and Plaintiffs on the evening in question; (ii) M.K. was never threatened or coerced by anyone to engage in sexual activity; and (iii) multiple individuals were present at 438 Howard Street to corroborate Plaintiffs' account of the evening.

122.     During Browning's interview, he advised that he believed certain videos of the evening existed.  He told his interviewers that he did not have any such videos on his phone or computer, but that he would attempt to find them.  Ultimately, as discussed below, Browning was expelled before having an opportunity to locate and provide the University Defendants with videos that were (and are) corroborative of M.K.'s voluntary and consensual activity on the evening in question.

123.     At the conclusion of the interviews, Plaintiffs were given a letter drafted and signed by Bruskotter advising them that, due to the M.K.'s complaint submitted to the University, Plaintiffs were prohibited from any contact with M.K.  Plaintiffs complied with the non-contact requirement.

124.      In summary, all witnesses, including Plaintiffs, told the University that M.K. consented to the sexual activity.  All witnesses told the University that M.K. had the capacity to consent to the sexual activity.  Indeed, all witnesses told the University that, had he or she witnessed any form of abuse, he or she would have intervened to assist M.K.  Because of past experiences, one of these female witnesses has a high vigilance for domestic violence situations and would not have hesitated to intervene.

125.      All in all, the University Defendants' total "investigation" lasted approximately 24 hours.

126.     The University did not follow-up to attempt to obtain any videos referenced by anyone.

**Expulsion Letter - October 3, 2014**

127.     The University failed to provide a prompt, fair, impartial, and thorough investigation.  The University also failed to conduct a hearing on this matter.

27

128.     Nevertheless, the University expelled Plaintiffs on Friday, October 3, 2014. Plaintiffs received correspondence from Bruskotter on October 3, 2014 ("Expulsion Letters"), stating that the University had completed its sham investigation; that the University found M.K.'s complaint against Plaintiffs factual; that Plaintiffs were responsible for the sexual assault; and that Plaintiffs were permanently dismissed as University of Findlay students.  The Expulsion Letters required Plaintiffs to leave campus with all of their belongings by noon on Saturday, October 4, 2014, and that they were indefinitely prohibited from ever appearing at any University-affiliated event on-campus or off-campus.  Finally, the Expulsion Letters advised Plaintiffs of their right to and the timing of an appeal, which had to be filed within 72 hours (or by noon on Monday, October 6, 2014).

129.     Consistent with the Expulsion Letters, prior to noon on Saturday, October 4, 2014, Browning left campus and returned to his parents' home in Michigan; Baity returned to his parents' home in Kentucky.

**Defamatory Email - October 6, 2014**

130.     By noon on Monday, October 6, 2014, despite having to move all of their belongings out of 438 Howard Street and traveling back to their out-of-state homes, Plaintiffs timely submitted their written appeals in response to the Expulsion Letters as required under the Sexual Assault Policy.

131.     Several hours later, the University sent a defamatory email to the entire University of Findlay community ("Campus Notification").   Upon information and belief, the Campus Notification was sent to current students, faculty, and the parents of current students.  The Campus Notification specifically identified Browning and Baity, falsely stated that they sexually assaulted a female student, and indicated that Plaintiffs were expelled from the University as a result of this conduct.

28

132.    H.S., having heard M.K.'s boasting several days earlier, became sick to her stomach when she read the defamatory Campus Notification.  She approached her Resident Assistant (Miller), about M.K.'s false accusations.  Miller told her to forget about it because the decision had already been made.

133.    Upon information and belief, the University Defendants never questioned any of the students present in M.K.'s dormitory on the morning of September 21, 2014, about the allegations.  After receiving the Campus Notification, Miller was never questioned and she never told the University about M.K.'s statements the morning after the alleged incident.

134.    On October 6, 2014, numerous media outlets received word of Plaintiffs' expulsion from, upon information and belief, the University Defendants.  On October 6, 2014, and thereafter, numerous news stories were published by *The Pulse* (a University of Findlay publication), *Toledo News Now*, *Evansville Courier & Press*, *The Toledo Blade*, *Review Times*, and several local and regional television news organizations.  The media reports specifically identified Plaintiffs by name, posted photos of each of Plaintiffs, and reported that Plaintiffs had been expelled from the University for sexually assaulting a University of Findlay student.

## **Permanent Expulsion - October 10, 2014**

135.    Emsweller denied the appeals filed by Browning and Baity in separate letters, dated October 10, 2014.  Despite an expulsion from the University, Emsweller failed to particularize the letters.  Instead, he sent the same letter to each Plaintiff.

136.    For students generally, the University purports to provide fair and unbiased procedures, as set forth in the various policies and procedures outlined above.  However, the University selected Plaintiffs – two African-American males alleged to have sexually assaulted a Caucasian female – for serial and deliberate failures to provide those procedures, and instead

29

substituted a conclusory process omitting every single protection.  This was intentional discrimination against Plaintiffs on the basis of their race, ethnicities, and/or gender.

### Post-Expulsion Information Received

137.    On or about October 11, 2014, J.F. wrote an email to the University Defendants informing them that M.K. bragged about having voluntary and consensual sexual activity with Plaintiffs.

138.    On or about October 13, 2014, the University Defendants interviewed J.F.  The interview supported J.F.'s email that M.K. engaged in voluntary and consensual activity with Plaintiffs.

139.    On or about October 13, 2014, the University Defendants interviewed Z.W. Although the University Defendants knew that Z.W. was a witness to some of the events of the night in question, the University Defendants did not interview him prior to its decision to expel Plaintiffs or to deny Plaintiffs' appeal.  Upon information and belief, Z.W. provided a statement that any sexual activity between Plaintiffs and M.K. was voluntary and consensual for all who participated.  Additionally, Z.W. advised the University Defendants that he was aware that certain videos were taken on the evening in question.  The University Defendants did not follow-up to attempt to locate any referenced videos.

### No Criminal Prosecution

140.    Upon information and belief, Plaintiffs have been led to believe that M.K. filed a criminal complaint with the Findlay Police Department.  Moreover, upon information and belief, the Findlay Police Department investigated the allegations made by M.K., and turned their investigation, or the results of that investigation, if any, over to the Hancock County prosecutor.

141.    Upon information and belief, Plaintiffs understand that, based on that investigation, the prosecutor's office closed the case. As of the date of the filing of this Complaint,

neither Browning nor Baity has been formally charged with any crime by either the Findlay Police Department or any other law enforcement authority.

**Harm to Plaintiffs**

142.    The damage and harm to Plaintiffs caused by the Defendants' misconduct, as alleged above and below, is immense.  Plaintiffs' reputations have been shattered.  In that regard, an Internet search of their names invariably results with media articles re-publishing the false and defamatory results of the University Defendants' sham investigation and M.K.'s false and defamatory allegations against Plaintiffs of sexual assault.

143.    The above-referenced misconduct of Defendants has resulted in, *inter alia*, emotional distress, injury to reputation, past and future economic loss, deprivations of due process, loss of educational and athletic opportunities, and loss of future career prospects and/or earnings.

144.    Plaintiffs' academic and education record has been irrevocably damaged.  As a mere example of the damage done by Defendants, Browning has thus far been denied entrance to at least two universities – University of Mount Union in Alliance, Ohio, and Ohio Northern University in Ada, Ohio – as a direct and proximate result of the Defendants' misconduct.  Baity, who was being recruited by a prominent Division I basketball program, was denied entrance to school as a direct and proximate result of the Defendants' misconduct.  In that regard, upon information and belief, when these aforementioned schools have reached out to the University, one or more of the University Defendants have defamed and disparaged Plaintiffs.

**CAUSES OF ACTION**

**COUNT I**

**RACIAL DISCRIMINATION IN VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

**UNIVERSITY DEFENDANTS**

145.   Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

146.   Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq*., provides in pertinent part that

> [n]o person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

147.   Title VI applies to the University.  More specifically, Title VI applies to all of the programs, activities, and operations of the University, including but not limited to, the investigation and disciplinary proceedings that are the subject of this lawsuit.

148.   Pursuant to Title VI, the University Defendants are prohibited from intentionally discriminating against any persons, including Plaintiffs, on the basis of race, color, or national origin.

149.   The University Defendants intentionally discriminated against Plaintiffs on the basis of race, color, or national origin.  Indeed, the University Defendants' conduct during the sham-interview process was motivated by race and Plaintiffs' race was a determining factor throughout the sham investigation.  The University Defendants' decision to suspend and expel Plaintiffs from school was also motivated by race and Plaintiffs' race was a determining factor in the outcome of the sham investigation and disciplinary proceedings.

150.    Plaintiffs, who are both African-American, are part of a protected class.

151.    M.K. is Caucasian.

152.    Each of the University Defendants are Caucasian.

153.    Plaintiffs and M.K. engaged in voluntary and consensual sexual activity.

154.    Plaintiffs informed the University Defendants that the sexual activity between Plaintiffs and M.K. was voluntary and consensual.

155.    As set forth in the allegations above, the University Defendants interviewed at least five of the witnesses who were present in the Howard Street house during Plaintiffs' and M.K.'s consensual sexual activities.  All of these witnesses provided statements informing the University Defendants that the sexual activity between Plaintiffs and M.K. was voluntary and consensual.

156.    Upon information and belief, the only person to provide any information to the University Defendants that the sexual activity was involuntary and/or non-consensual was M.K. through a handwritten statement.  Rather than question and/or cross-examine any of M.K.'s written allegations, the University Defendants failed and/or refused to interview M.K., electing instead to accept her written statement wholesale.

157.    Despite the overwhelming evidence provided to the University Defendants during the sham investigation, the University Defendants accepted M.K.'s handwritten version of the events, and completely discounted and ignored Plaintiffs' versions of the events.  The University Defendants' decision to do so was motivated by Plaintiffs' being African-American and M.K.'s being Caucasian.

158.    The University has a pattern of decision-making demonstrating that it consistently discriminates against African-American males when investigating allegations of sexual assault involving Caucasian females.

33

159.   Upon information and belief, approximately eighty-five percent (85%) of the University's students are Caucasian, while less than two percent (2%) are African-American males. *See* University Enrollment.  Yet, over the last two years, and in addition to Plaintiffs, upon information and belief, the only students to have been expelled from the University based upon allegations of sexual assault have been African-American, while the accusing female is Caucasian:

(a)   According to the University's Clery Act reporting information, one (1) sexual assault incident was reported in 2013.  Upon information and belief, the male involved in that incident was African-American and the female involved was Caucasian.

(b)   In November 2014, an African-American male was expelled from the University based on an allegation of sexual assault.  Upon information and belief, the female involved in that incident was Caucasian.

160.   Upon information and belief, if Plaintiffs were Caucasian or if M.K. was African-American, the University would not have dismissed Plaintiffs from the University.

161.   As a direct and proximate result of the above-referenced racial discrimination, Plaintiffs have been substantially damaged in an amount to be proven at trial, but in any event, in excess of $75,000 for each Plaintiff, based upon the following: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects and/or earnings.

162.   As a direct and proximate result of the above-referenced racial discrimination, Plaintiffs are entitled to compensatory damages and punitive damages.

163.   Pursuant to 42 U.S.C. § 1988(b), Plaintiffs demand an award of their reasonable attorneys' fees.

## COUNT II

## RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

### UNIVERSITY DEFENDANTS

164.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

165.    Title 42, section 1981 of the United States Code prohibits intentional race discrimination in the making and enforcing of contracts, both public and private.

166.    The University Defendants are subject to the requirements of 42 U.S.C. § 1981.

167.    The relationship between the University Defendants and Plaintiffs is contractual in nature, with the University's Sexual Assault Policy, the Title IX Investigation Policy, the Student Handbook, the Anti-Discrimination Policy, and other published policies and procedures supplying the contract terms between the parties.

168.    In the Anti-Discrimination Policy, the University promises and agrees to the following:

> Each individual has the right to study and work in an atmosphere which promotes equal opportunities and prohibits discriminatory practices and harassment based upon age, race, ethnicity, national origin, color, religion, gender, handicap, sexual orientation, genetic information, veteran or military status and physical or mental disabilities.

*Id.*

169.    The Anti-Discrimination Policy further provides that "[t]hese policies apply to all faculty, staff and students and prohibit harassment, discrimination and retaliation." *Id.*

170.    Based upon the above-referenced allegations, the University Defendants have breached its contracts with Plaintiffs, as more particularly described in Count V below, which allegations are incorporated by reference in the herein Count, and in doing so, intentionally

35

discriminated against Plaintiffs on the basis of race. The University Defendants' conduct throughout the sham investigation, as well as the outcome of the sham investigation, was motivated by race. Plaintiffs' race was a determining factor in the outcome of the sham investigation and disciplinary proceedings.

171.    Plaintiffs were not afforded a fair, impartial, or thorough investigation as required by the Student Handbook, the Sexual Assault Policy, the Title IX Investigation Policy, and the Title IX Investigation Procedures based on their being African-American and M.K.'s being Caucasian.

172.    As a direct and proximate result of the above-referenced racial discrimination, Plaintiffs have been substantially damaged in an amount to be proven at trial, but in any event, in excess of $75,000 for each Plaintiff, based upon the following: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects and/or earnings.

173.    As a direct and proximate result of the above-referenced racial discrimination, Plaintiffs are entitled to compensatory damages and punitive damages.

174.    Pursuant to 42 U.S.C. §§ 1988(b) and (c), Plaintiffs demand an award of their reasonable attorneys' fees and any expert witness fees.

**COUNT III**

**GENDER DISCRIMINATION IN VIOLATION OF TITLE IX OF THE EDUCATION
AMENDMENTS OF 1972**

**UNIVERSITY DEFENDANTS**

175.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

176.    As stated above, Title IX prohibits discrimination in an education setting on the basis of sex, and includes all of the school's operations.  Because the University receives federal financial assistance, it is subject to Title IX.

177.    Title IX requires a school's grievance procedures related to a complaint of sexual assault to provide, at a minimum, "provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence." Questions and Answers on Title IX and Sexual Violence, United States Department of Education Office of Civil Rights at p. 12 (Apr. 29, 2014) ("Q&A on Title IX").[4]  In addition, "[t]he rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights." *Id.* at 13.

178.    Title IX requires that schools "ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the [school's] grievance procedures operate." Dear Colleague Letter, United States Department of Education Office of Civil Rights at p. 7 (Apr. 4, 2011) ("Dear Colleague Letter").[5]

179.    The Department of Education's Office for Civil Rights ("OCR") has reported that a typical investigation takes up to 60 calendar days following receipt of the complaint. *See id.* at 12.

---

[4] The Department of Education determined that the Q&A on Title IX is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices.

[5] The Department of Education determined that the Dear Colleague Letter is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices.

180.    Upon information and belief, in virtually all cases of campus sexual misconduct, the accused student is male and the accusing student is female.  Based on the foregoing allegations herein, the University's policies and procedures are set up to disproportionately affect the male student population of the University community as a result of higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

181.    Upon information and belief, representatives of the University have stated that its policy related to investigating sexual assault allegations require it to find in favor of the female making the allegations.  In other words, upon information and belief, it is an institutional policy that, when a female alleges she has been sexually assaulted, the University always determines that a sexual assault occurred and dismisses the male student.

182.    The University's receipt of the OVW Grant further underscores its gender bias against males in the context of complaints of sexual assault.  The OVW Grant was awarded from the U.S. DOJ's Office of Violence Against Women, with the Grant's purpose being, upon information and belief, to reduce sexual assault against women.  The receipt of these federal funds by the University only emboldened the University Defendants' gender bias against males in circumstances of sexual assault complaints, including Plaintiffs.

183.    The University has created an environment in which Plaintiffs, accused male students, especially those who are African-American and/or are members of a protected class, were fundamentally denied due process as to be virtually assured of a finding of guilt, regardless of the evidence or lack thereof.  In that regard, the University and the University Defendants collectively and individually, as well as in their professional and personal/individual capacities, have historically and systematically discriminated against males accused of sexual assault by females.  Such a biased and one-sided process deprived Plaintiffs, as male students, of educational opportunities on the basis of sex.

38

184.     Plaintiffs did not sexually assault M.K. They were and are innocent of any wrongdoing.   A thorough and fair investigation, as well as engaging in a fundamentally-fair hearing process, would have supported Plaintiffs' innocence.

185.     The following factors demonstrate the evidentiary weaknesses behind the finding of the offense of sexual assault, which demonstrates the University Defendants' gender bias:

> (a)     The University Defendants never interviewed M.K.  Instead, they took her written statement as true and provided her favorable treatment because of her gender.
>
> (b)     The University Defendants failed to interview all independent male witnesses prior to Plaintiffs' expulsion.
>
> (c)     The University Defendants' sham investigation focused primarily on independent female witnesses prior to Plaintiffs' expulsion.
>
> (d)     The University Defendants interviewed a female who was neither a witness nor who had knowledge of any of the events in question.
>
> (e)     The University Defendants attempted to coerce and intimidate the independent female witnesses into changing their statements.
>
> (f)     The facts demonstrate that M.K. voluntarily consented to all sexual activity.
>
> (g)     The facts demonstrate that M.K. had the capacity to voluntarily consent to all sexual activity.
>
> (h)     During the sex acts, M.K. was heard to vocalize enjoyment and encouragement.  Indeed, M.K. initiated the sexual conduct and was in control of her own actions.  She consistently and (loudly enough to hear it outside the bedroom) used words of affirmation, such as "yes" and "yeah."
>
> (i)     M.K.'s complaint is inconsistent with her prior boasting to her dormitory friends and Resident Assistant, and to J.F.
>
> (j)     The University Defendants failed to attempt to obtain any exculpatory videos referenced by anyone.

186.     Each of the above-referenced facts provide reason to doubt the veracity of the allegation and finding that Plaintiffs sexually assaulted M.K.  Indeed, based solely upon M.K.'s handwritten statement, the University Defendants predetermined that it would discipline Plaintiffs. In other words, Plaintiffs' gender, not the facts of the sham investigation, determined the outcome.

187.    The following procedural flaws existed, which also provide overwhelming reason to doubt the veracity of the findings against Plaintiffs:

(a)    The entire process from the time M.K. filed her complaint until Plaintiffs were notified of their expulsion occurred in less than 48 hours, which did not include sufficient time for the University Defendants to follow each of the requirements the University promises to follow in the Title IX Investigation Procedure.

(b)    Plaintiffs were never provided with an opportunity, as required under Title IX, to present witnesses and evidence.

(c)    Plaintiffs were not provided with an advisor of their choice, as required under the Sexual Assault Policy.

(d)    Prior to their expulsion, the University Defendants **never** disclosed to Plaintiffs the facts and circumstances of M.K.'s complaint against them, other than to state generally that it was sexual assault.

(e)    The University Defendants never interviewed M.K,

(f)    Prior to Plaintiffs' expulsion, the University Defendants did not interview all of the witnesses of the events at 438 Howard Street on the night of the alleged incident, despite knowing the identity of such witnesses.

(g)    The University Defendants did not interview certain witnesses who were present at M.K.'s dorm the day after the alleged incident in which M.K. was boasting about her sexual encounter with Plaintiffs.

(h)    The University Defendants failed to attempt to obtain any exculpatory videos referenced by anyone.

(i)    The University Defendants failed to conduct a hearing on this matter.

(j)    The University Defendants misapplied the standard of whether M.K. was incapacitated under the Sexual Assault Policy – which standard is "whether a sober, reasonable person in the same position should have known that the other party was incapacitated and therefore unable to consent" – because a number of the witnesses the University Defendants interviewed (Baity, Q.J., and K.A.) were sober on the night of the alleged incident and stated that M.K. could and did consciously and voluntarily consent to sexual activity with Plaintiffs.

(k)    The University Defendants threatened a female witness, who provided a statement supporting Plaintiffs' position that the sexual activity with M.K. was voluntary and consensual, with expulsion if she did not change her story.

(l)     The University Defendants terminated and re-assigned a work-study position held by another female witness, who provided a statement supporting Plaintiffs' position that the sexual activity with M.K. was voluntary and consensual, because the University claimed the female witness was lying and that she failed to come to the alleged aid of M.K. during the night of the alleged incident.

(m)     After receipt of the Campus Notification, the Resident Assistant failed to report the inconsistency between M.K.'s complaint and M.K.'s statements the morning after the events.

(n)     Based upon these procedural flaws, upon information and belief, the University's Title IX Coordinator and those individuals who participated in the University's sham investigation lacked adequate training on Title IX and the University's grievance policies and procedures.

188.    All of the above-referenced factual and procedural flaws are based, in whole or in part, on the University's discrimination against Plaintiffs because they were males and M.K. was a female.  Indeed, representatives of the University have stated that, once a female complains of sexual assault, the University must automatically take disciplinary action against the male.  Males have invariably lost when a female complains of sexual assault at the University.

189.    The University Defendants' conduct demonstrates that, once M.K., a female, complained that she was sexually assaulted by Plaintiffs, males, the University Defendants had no intention to follow its established and promised policies and procedures – and, indeed, did not follow such policies and procedures.  The University Defendants' conduct in this regard is evidence and demonstrative of its gender bias against Plaintiffs.

190.    The above-referenced allegations demonstrate that the University Defendants intentionally discriminated against Plaintiffs on the basis of gender.  Indeed, the University Defendants' decision to suspend and expel Plaintiffs from school was motivated by gender and Plaintiffs' gender was a determining factor in the outcome of the sham investigation and disciplinary proceedings.

191.    The above-referenced allegations demonstrate that the University Defendants reached an erroneous outcome against Plaintiffs due to their gender discrimination and bias toward Plaintiffs.

192.    The above-referenced allegations demonstrate the University Defendants' deliberate indifference in their gender discrimination toward Plaintiffs because their conduct was clearly unreasonable in light of the known circumstances.

193.    As a direct and proximate result of its discriminatory practices, Plaintiffs were denied a minimally-fair process, denied their due process rights, denied due process generally, subjected to the University Defendants reaching an erroneous outcome, and being damaged in an amount to be determined at trial, but in any event, in excess of $75,000.

194.    As a direct and proximate result of the above-referenced gender discrimination, Plaintiffs have been substantially damaged in an amount to be proven at trial, but in any event, in excess of $75,000 for each Plaintiff, based upon the following: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects and/or earnings.

195.    As a direct and proximate result of the above-referenced gender discrimination, Plaintiffs are entitled to compensatory damages and punitive damages.

196.    Pursuant to 42 U.S.C. § 1988(b), Plaintiffs demand an award of their reasonable attorneys' fees.

## COUNT IV

## VIOLATION OF DUE PROCESS AND EQUAL PROTECTION – 42 U.S.C. § 1983

### UNIVERSITY DEFENDANTS

197.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

198.    The Fifth Amendment to the United States Constitution states, "No person shall . . . be deprived of life, liberty, or property, without due process of law."

199.    The Due Process Clause contained within the Fifth Amendment of the United States Constitution applies to higher education institutions, and in particular, investigation procedures and disciplinary decisions, because those processes and procedures have the potential to deprive a person of property and liberty, including loss of reputation, loss of education, and loss of status as a student.

200.    The Due Process Clause contained within the Fifth Amendment of the United States Constitution applies to the University, including the University Defendants' sham investigation and disciplinary decision reached regarding Plaintiffs.

201.    The University Defendants acted under color of law pursuant to the "state compulsion," "nexus/joint action," and/or the "public function" tests, based on the following:

(a)    The OCR has issued guidance regarding the handling of sexual assault allegations at universities and colleges, including the Q&A on Title IX and Dear Colleague Letter (collectively, "OCR Guidance").

(b)    The University Defendants were compelled by the OCR to adopt and implement the OCR Guidance.  Alternatively, upon information and belief, the University Defendants believed they were compelled by the OCR to adopt and implement the OCR Guidance within the University's policies and procedures.

(c)    The University Defendants' compulsion (or perceived compulsion) to follow the OCR Guidance is based upon all or any of the following:

i.    The University's receipt of the OVW Grant.

ii.    The OCR's expressed and published threats that a failure to address problems identified by OCR may result in the withholding of federal funding to universities and colleges, which includes the University, or may result in a referral to the United States Department of Justice for further civil or criminal action. *See, e.g*, Dear Colleague Letter at 16.

iii.    The OCR publicly discloses a listing of schools that it is investigating under Title IX for their handling of complaints of

sexual misconduct.  This public disclosure has the potential to mar the reputation of a university, particularly a university such as the University of Findlay which received the OVW Grant specifically aimed at sexual assault processes and procedures.

202.    The OCR Guidance was adopted without administrative rule-making process and the opportunity for public comment.

203.    The OCR Guidance, as written and as applied by the University Defendants, deprived Plaintiffs of their constitutional due process protections, including, but not limited to the following:

(a)    The denial of fundamental fairness in the University's sham investigation;

(b)    The denial of the right to the assistance of counsel;

(c)    The denial of the right to an advisor;

(d)    The denial of the right to a pre-deprivation hearing;

(e)    The denial of the right to cross-examine witnesses against Plaintiffs, and to present evidence and witnesses in Plaintiffs' favor;

(f)    The application of overly-restrictive confidentiality requirements, which deprived Plaintiffs of the opportunity to obtain and present information and witnesses; and/or

(g)    Application of a "preponderance of the evidence standard," rather than a "beyond a reasonable doubt standard," even though a complaint of sexual assault (and the resulting public perception of being found guilty of sexual assault) is akin to criminal conduct.

204.    In fact, upon information and belief, representatives of the University have conceded to Plaintiffs and/or their representatives that Plaintiffs were not provided due process during the sham investigation or the resultant disciplinary decision.  In so conceding, the University representatives have defended the lack of providing due process protections on the improper and/or misguided belief that federal requirements or guidance, like the OCR Guidance, did not require the University Defendants to provide due process protections to Plaintiffs.

205.    The OCR Guidance, including its deprivation of due process, fundamental fairness and a reliable fact determination, which the University Defendants adopted, was determinative of the adverse outcome.

206.    The Fifth Amendment's promise of due process also entitles Plaintiffs to the equal protections of the law.

207.    The University Defendants implementation of the OCR Guidance into its policies, procedures, sham investigation, and disciplinary determination in this case, deprived Plaintiffs of the equal protections of the law by treating them differently than others similarly situated.  The unequal treatment was the result of discriminatory animus toward African Americans and males.

208.    The University Defendants' acts and/or omissions described above were reckless, taken in bad faith, pursuant to a lack of due care and reasonable prudence, and based on ill will, malice, spite and a conscious disregard for the substantial rights of Plaintiffs.

209.    The University Defendants' acts and/or omissions were extreme and outrageous; arbitrary and capricious; and went beyond all possible bounds of decency and tolerance in a civilized community.

210.    As a direct and proximate result of its discriminatory practices, Plaintiffs were denied a minimally-fair process, denied their due process rights, denied due process generally, subjected to the University Defendants' reaching an erroneous outcome, and being damaged in an amount to be determined at trial, but in any event, in excess of $75,000 for each Plaintiff.

211.    As a direct and proximate result of the above-referenced acts and/or omissions, Plaintiffs have been substantially damaged in an amount to be proven at trial, but in any event, in excess of $75,000 for each Plaintiff, based upon the following: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects and/or earnings.

212.    As a direct and proximate result of the above-referenced acts and/or omissions, Plaintiffs are entitled to compensatory damages and punitive damages.

213.    Pursuant to 42 U.S.C. §§ 1988(b) and (c), Plaintiffs demand an award of their reasonable attorneys' fees and any expert witness fees.

**COUNT V**

**BREACH OF CONTRACT**

**UNIVERSITY DEFENDANTS**

214.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

215.    The policies and procedures related to the Title IX Investigation Policy, including, but not limited to, the Title IX Investigation Procedures; the Sexual Assault Policy; the Student Handbook; the Anti-Discrimination Policy; and/or other institutional documents the University provides to its students (including Plaintiffs) create express contracts between the University and Plaintiffs.

216.    Plaintiffs performed and met all obligations and conditions of said contracts.

217.    The University breached the contracts as set forth in the allegations above by, *inter alia*, violating the provisions related to conducting Title IX investigations related to a sexual assault complaint.

218.    The above-stated facts demonstrate that the University breached the following contractual provisions established in the Title IX Investigation Policy and Title IX Investigation Procedures:

(a)    The University failed to provide to Plaintiffs a "prompt, fair and impartial investigation."

(b)    The University failed to "maintain the confidentiality of information during" its Title IX "review and investigation."

46

(c)     The University's "Notice of Investigation" that it sent to Plaintiffs did not include a "summary of the complaint" as required under the Title IX Investigation Procedures.

(d)     The University failed to interview all "pertinent witnesses" as required under the Title IX Investigation Procedures, most importantly, M.K.

(e)     The University failed to "[i]dentify and collect" all "evidence pertinent to the investigation" as required under the Title IX Investigation Procedures.

(f)     The University failed to conduct a hearing in this matter.

(g)     The University's investigation was a sham and, upon information and belief, because of the haste with which the University conducted the investigation, it failed to follow procedures required under the Title IX Investigation Procedures.

219.    The above-stated facts demonstrate that the University breached the following contractual provisions established in the Sexual Assault Policy:

(a)     The University failed to apply the appropriate standard of "incapacitated," which is defined as "whether a sober, reasonable person in the same position should have known that the other party was incapacitated and therefore unable to consent."

(b)     The University failed to "take care to protect the identities of the parties by discussing the allegations only with those who have a legitimate administrative or legal reason to know."

(c)     The University failed to "conduct a prompt, impartial, and thorough investigation."

(d)     The University failed to appoint personnel to the investigation "who receive annual training on issues related to domestic violence, dating violence, sexual assault, and stalking, as well as investigation procedures that . . . promotes accountability."

(e)     The University failed to conduct the investigation "in a fair and impartial manner."

(f)     The University failed to provide Plaintiffs of "the opportunity to be accompanied to interviews or other related meetings by an advisor of their choice."

(g)     The University threatened and coerced several female witnesses in an attempt "to prevent the institution from investigating incidents of these actions or to 'cover up' their occurrence."

220.    The above-stated facts demonstrate that the University breached the following contractual provisions established in the Student Handbook:

(a)    The University failed to afford Plaintiffs with the "basic civil and human rights immunities which the University has a duty to protect."

(b)    The University failed to afford Plaintiffs with the "protection of rights" with "the goal of equality of treatment for all within the requirements of state and federal law."

(c)    The University violated its confidentiality policy with respect to Plaintiffs' education record, which states that, "[e]xcept under legal compulsion, information contained in such records . . . will not be released to agencies outside the University without written consent of the student."

(d)    The University failed to advise Plaintiffs "of the specific allegations made against [them], and that [Plaintiffs are] not required to make any statement but may voluntarily make a statement and explanation of the facts and submit information in proof of the same."

(e)    The University failed to afford Plaintiffs of the opportunity to request "that the vice president for student affairs adjudicate the matter and not make a referral to the Conduct and Discipline Committee."

(f)    The University failed to furnish Plaintiffs "with a written statement of allegations against [them] along with a notice of the time and place of the Conduct and Discipline Committee meeting."

(g)    The University failed to provide Plaintiffs with a "reasonable opportunity to introduce information by way of written and/or oral statements from witnesses and otherwise in [their] own defense."

(h)    The University violated its Anti-Discrimination Policy by, *inter alia*, committing the above-referenced racial and gender discrimination.

221.    The above-stated facts also demonstrate that the University breached the duty of good faith and fair dealing that is implied in every contract under Ohio law.

222.    As a direct and proximate result of the University's breaches of contracts, Plaintiffs have been substantially damaged in an amount to be proven at trial, but in any event, in excess of $75,000 for each Plaintiff.

## COUNT VI

## PROMISSORY ESTOPPEL

### UNIVERSITY DEFENDANTS

223.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

224.    The University promised to Plaintiffs that it would follow its policies and procedures relating to the Title IX Investigation Policy, including Title IX Investigation Procedures; the Sexual Assault Policy; the Student Handbook; the Anti-Discrimination Policy; and/or other institutional documents the University provides to its students, including Plaintiffs.

225.    As stated in the above-stated allegations, the University failed to honor its promise to follow the aforementioned policies and procedures.

226.    Plaintiffs had a right to rely upon, and did rely upon, the University's promise that it would follow the aforementioned policies and procedures.

227.    As a direct and proximate result of the University's failures and/or refusals to honor its promises, Plaintiffs have been substantially damaged in an amount to be proven at trial, but in any event, in excess of $75,000 for each Plaintiff.

## COUNT VII

## NEGLIGENCE AND NEGLIGENT TRAINING

### UNIVERSITY DEFENDANTS

228.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

229.    The University Defendants owed duties of care to Plaintiffs.  Such duties included, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of sexual assault against Plaintiffs.

230.    The University Defendants also owed Plaintiffs a duty of reasonable care to ensure that its employees, including the individuals named in this Complaint, were properly and appropriately trained to conduct sexual assault investigations consistent with the University's policies and procedures, as well as applicable federal law.

231.    Through their acts and/or omissions set forth above, the University, acting through its agents, servants, and/or employees, breached said duties by carelessly, improperly, and negligently performing their assigned duties, mischaracterizing the truth, ignoring clear evidence of Plaintiffs' innocence, failing to train relevant employees, including the individuals named in the Complaint, and facilitating a process that violated the rights and other protected interests of Plaintiffs.

232.    The University Defendants' breaches were done in bad faith, pursuant to a lack of due care and reasonable prudence, and based on ill will, malice, spite, and a conscious disregard for the substantial rights of Plaintiffs.

233.    As a direct and proximate result of the University Defendants' acts and/or omissions, Plaintiffs have suffered damages, in an amount exceeding $75,000 for each Plaintiff, the exact amount of which will be proven at trial.  Such damages include, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, past and future economic loss, and other direct and consequential damages.

234.    In addition to economic and non-economic damages, Plaintiffs are entitled to recover punitive damages, including reasonable attorneys' fees, to punish the University Defendants for its outrageous conduct pursued out of actual malice that recklessly and callously disregarded Plaintiffs' rights, to discourage the University Defendants from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar conduct.

## COUNT VIII

## DEFAMATION *PER SE*

## UNIVERSITY DEFENDANTS AND M.K.

235.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

236.    The statements made in the Campus Notification that Plaintiffs were guilty of sexual assault were made to others, including, but not limited to, University students, faculty, and parents, and were false and defamatory.

237.    By sending the Campus Notification that stated Plaintiffs were guilty of sexual assault in writing to third parties, the University Defendants published defamatory statements regarding Plaintiffs, without privilege to do so.  In addition, by communicating with other third parties, including without limitation certain media outlets, that Plaintiffs were guilty of sexual assault, the University Defendants further published defamatory statements regarding Plaintiffs, without privilege to do so.

238.    In addition, the University Defendants have continued to publish defamatory statements regarding Plaintiffs, without privilege to do so, by communicating (verbally and/or in writing) to various universities and/or colleges into which Plaintiffs have attempted to gain entrance that Plaintiffs were guilty of sexual assault.

239.    M.K. made statements, orally or in writing, to the University administration and to other University students that Plaintiffs sexually assaulted her, which statements were false and defamatory.

240.    By making said statements, orally or in writing, to third parties, M.K. published defamatory statements regarding Plaintiffs, without privilege to do so.

51

241.    The false and defamatory statements made by the University Defendants and M.K. were words that import a charge of an indictable offense involving moral turpitude or infamous punishment and therefore constitute defamation *per se*.

242.    Defendants made these false and defamatory statements with malice, ill will, spite, and with a conscious disregard for the rights of Plaintiffs.

243.    As these false and defamatory statements made by Defendants constitute defamation *per se*, actual damages are presumed.  Nevertheless, Plaintiffs have suffered actual harm in the form of:

>    (a)    Plaintiffs have been and/or currently are viewed with hatred and/or contempt;
>
>    (b)    Plaintiffs suffered mental anguish, humiliation, and a great loss of reputation; and
>
>    (c)    Plaintiffs were expelled from the University, which has resulted in, *inter alia*, difficulty in gaining entrance to another university comparable to the University, other lost educational opportunities, lost athletic opportunities, and reduced future earning capacity.

244.    As a direct and proximate result of Defendants' defamation, Plaintiffs have suffered damages, in an amount exceeding $75,000 for each Plaintiff, the exact amount of which will be proven at trial.  Such damages include, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, past and future economic loss, and other direct and consequential damages.

245.    In addition to economic and non-economic damages, Plaintiffs are entitled to recover punitive damages, including reasonable attorneys' fees, to punish Defendants for their outrageous conduct pursued out of actual malice that recklessly and callously disregarded Plaintiffs' rights, to discourage Defendants from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar conduct.

## COUNT IX

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### UNIVERSITY DEFENDANTS AND M.K.

246.     Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

247.     Defendants' acts and/or omissions described above were reckless, taken in bad faith, pursuant to a lack of due care and reasonable prudence, and based on ill will, malice, spite and a conscious disregard for the substantial rights of Plaintiffs.

248.     Defendants knew or should have known that their acts and/or omissions would result in serious emotional distress to Plaintiffs.

249.     Defendants' acts and/or omissions were extreme and outrageous going beyond all possible bounds of decency and tolerance in a civilized community.

250.     Defendants' acts and/or omissions were a direct and proximate cause of Plaintiffs' injuries.

251.     Plaintiffs' mental anguish and/or injuries suffered are serious and of a nature that no reasonable person could be expected to endure them.

252.     As a direct and proximate result of Defendants' acts and/or omissions, Plaintiffs have suffered damages, in an amount exceeding $75,000 for each Plaintiff, the exact amount of which will be proven at trial.  Such damages include, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, past and future economic loss, and other direct and consequential damages.

253.     In addition to economic and non-economic damages, Plaintiffs are entitled to recover punitive damages, including reasonable attorneys' fees, to punish Defendants for their outrageous conduct pursued out of actual malice that recklessly and callously disregarded

Plaintiffs' rights, to discourage Defendants from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar conduct.

## COUNT X

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### UNIVERSITY DEFENDANTS AND M.K.

254.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

255.    Defendants' acts and/or omissions described above were negligent and in disregard for the rights and safety of Plaintiffs.

256.    Defendants' acts and/or omissions were negligent and it was reasonably foreseeable said acts/or omissions would result in serious emotional distress to Plaintiffs.

257.    Defendants' acts and/or omissions were extreme and outrageous going beyond all possible bounds of decency and tolerance in a civilized community.

258.    Defendants' acts and/or omissions were a direct and proximate cause of Plaintiffs' injuries.

259.    Plaintiffs' mental anguish and/or injuries suffered are serious and of a nature that no reasonable person could be expected to endure them.

260.    As a direct and proximate result of Defendants' acts and/or omissions, Plaintiffs have suffered damages, in an amount exceeding $75,000 for each Plaintiff, the exact amount of which will be proven at trial.  Such damages include, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, past and future economic loss, and other direct and consequential damages.

261.    In addition to economic and non-economic damages, Plaintiffs are entitled to recover punitive damages, including reasonable attorneys' fees, to punish Defendants for their

outrageous conduct pursued out of actual malice that recklessly and callously disregarded Plaintiffs' rights, to discourage Defendants from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar conduct.

## COUNT XI

## DECLARATORY JUDGMENT

### UNIVERSITY DEFENDANTS

262.    Plaintiffs restate all of their statements and allegations set forth above as if fully rewritten herein.

263.    The University has committed numerous violations of the parties' contracts, and of federal and state law.

264.    Plaintiffs' education and future careers have been severely and irreparably damaged.  Without appropriate redress, the unfair outcome of the University Defendants' sham investigation will continue to cause irreversible damages to Plaintiffs' educational, athletic, and future employment and/or earning prospects.

265.    As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of Plaintiffs' formal educational record at the University.

266.    By reason of the foregoing, Plaintiffs request, pursuant to 28 U.S.C. § 2201, a declaration that:

   (a)    The outcome and findings made by the University Defendants during the sham investigation be reversed;

   (b)    Plaintiffs' reputation restored;

   (c)    Plaintiffs' education record, including any disciplinary records contained therein, be expunged as it relates to anything arising out of M.K.'s sexual assault complaint;

      (d)      The record of Plaintiffs' suspension and expulsion from the University be removed from their respective education records; and

      (e)      Any record of the University's sham investigation as it relates to anything arising out of M.K.'s sexual assault complaint be permanently destroyed.

**WHEREFORE**, Plaintiffs, Justin Browning and Alphonso Baity, II, demand judgment against Defendants, jointly and severally, for the following:

A.      As to Count I, compensatory damages, punitive damages, attorneys' fees, and costs in amounts to be proven at trial.

B.      As to Count II, compensatory damages, punitive damages, attorneys' fees, expert witness fees, and costs in amounts to be proven at trial.

C.      As to Count III, compensatory damages, punitive damages, attorneys' fees, and costs in amounts to be proven at trial.

D.      As to Count IV, compensatory damages, punitive damages, attorneys' fees, expert witness fees, and costs in amounts to be proven at trial.

E.      As to Count V, compensatory damages and costs in amounts to be proven at trial.

F.      As to Count VI, compensatory damages and costs in amounts to be proven at trial.

G.      As to Count VII, compensatory damages, punitive damages, attorneys' fees, and costs in amounts to be proven at trial.

H.      As to Count VIII, compensatory damages, punitive damages, attorneys' fees and costs in amounts to be proven at trial.

I.      As to Count IX, compensatory damages, punitive damages, attorneys' fees and costs in amounts to be proven at trial.

J.      As to Count X, compensatory damages, punitive damages, attorneys' fees and costs in amounts to be proven at trial.

K.      As to Count XI, the declarations set forth above.

L.      As to all counts, any and all additional relief that this Court deems just, proper and equitable.

## JURY DEMAND

Plaintiffs, JUSTIN BROWNING and ALPHONSO BAITY, II, hereby demand a jury to hear all issues so triable in this matter.

/s/ Michael R. Traven
Michael R. Traven (0081158)


Respectfully submitted,

FISHERBROYLES, LLP


/s/ Michael R. Traven
ROBERT B. GRAZIANO (0051855)
robert.graziano@fisherbroyles.com
MICHAEL R. TRAVEN (0081158)
michael.traven@fisherbroyles.com
P.O. Box 516
Columbus, OH  43216
Telephone:  614.721.5573
Facsimile:  614.573.7447


and

ANTHONY J. CALAMUNCI (0063937)
anthony.calamunci@fisherbroyles.com
6800 W Central Ave Unit E
Toledo, Ohio 43617
Telephone: 419.376.1776
Facsimile: 484.251.7797

Attorneys for Plaintiffs